# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ROBERTA DUHAIME, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL REQUESTED |
| DEPARTMENT OF AGRICULTURE, | ) | |
| MIKE YOUNG, SECRETARY | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR CIVIL RIGHTS VIOLATION AND EMPLOYMENT DISCRIMINATION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiff, ROBERTA DUHAIME (hereinafter referred to as "Plaintiff"), and files this Original Complaint complaining of Defendant MIKE YOUNG, in his capacity as SECRETARY, DEPARTMENT OF AGRICULTURE (hereinafter referred to as "Defendant Agency"), and in support thereof would show the Court as follows:

## I.   PARTIES

1.   Plaintiff, Roberta Duhaime, is an employee of Defendant Agency, Department of Agriculture.

2.   Defendant Agency, Department of Agriculture, is a federal administrative agency.

1

3.     Defendant Agency's Veterinary Services Western Region branch is located at 903 San Jacinto Boulevard, Suite 220, Austin, Texas 78701.

4.     Defendant Agency was the employer of Plaintiff at the time the events giving rise to the claim occurred.

5.     The Secretary of the Agency is Mike Young.

## II.     JURISDICTION AND VENUE

6.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e–16(c).

7.     Plaintiff has exhausted her administrative remedies as the U.S. Equal Employment Opportunity Commission (EEOC), Office of Federal Operations, issued a final decision on the merits of this case on December 6, 2016[1].

8.     Equitable and other relief are also sought under 28 U.S.C. § 2000e(5)(g)

9.     Venue is proper under 42 U.S.C § 2000e–5(f)(3) and 28 U.S.C. § 1391(e), as Defendant Agency operates the Cattle Fever Tick Eradication Program (CFTEP) in the Southern District of Texas, and is the location where a substantial part of the events giving rise to the claim occurred.

---

[1] While the EEOC Office of Federal Operations issued the final decision on December 6, 2016 and certified that it was mailed that same day, Plaintiff did not receive the decision until January 5, 2017. In support of this, Plaintiff has attached a copy of the envelope she received from the EEOC Office of Federal Operations with a postmark date of January 3, 2017.

10.    Additionally, Plaintiff resides in San Juan, Texas, located in the Southern District of Texas, and no real property is involved in the action.

### III.    FACTUAL BACKGROUND

11.    At all relevant times, Plaintiff was and is female.

12.    At all relevant times, Plaintiff was an is of Native American origin.

13.    At all relevant times, Plaintiff was and is employed by the Agency as an epidemiologist.

14.    Plaintiff was and is the only Veterinary Epidemiologist employed by Defendant Agency's Animal Plant and Health Inspection service (APHIS), Cattle Fever Tick Eradication Program (CFTEP) it its over 100 years of existence.

15.    Upon receiving her Doctorate of Veterinary Medicine (DVM) in June of 1989 from Cornell University's New York State College of Veterinary Medicine, Plaintiff applied along with 200 other applicants for an appointment with USDA's prestigious Public Veterinary Practice Career (PVPC) Program as a Veterinary Medical Officer (VMO) GS-0701-09.

16.    From those 200 applicants, Plaintiff was one of 27 who were selected for appointments to the position.

17.    Over the next few years, Plaintiff rose rapidly through APHIS.

18.    In June of 1990, Plaintiff served as a permanent APHIS VMO in Texas.

19.    Three months later Plaintiff was promoted to the GS-0701-11 level.

20.     One year later, in September of 1991, she was again promoted to a GS-0701-12.

21.     In May of 1993 she was promoted again to a GS-0701-13, after being competitively selected for the highly respected Epidemic Intelligence Service (EIS) Program, which is a prerequisite in APHIS for promotion to the GS-13 and above levels as an Epidemiologist.

22.     Upon completion of the two-year EIS program, Plaintiff was recruited to serve as a Staff Officer with the Veterinary Services' Emergency Program is APHIS Headquarters in Riverdale, Maryland.

23.     While serving in that position, Plaintiff was again promoted in 1997 to the GS-0701-14 Senior Staff Officer level.

24.     Due to her aging parents and a desire to return to field work, Plaintiff voluntarily took a VMO, GS-0701-12 position in Eastern Pennsylvania in late 1997.

25.     In late 2003, Plaintiff saw a job announcement for the newly created CFTEP Epidemiologist, GS-0414/0401-12 position.

26.     Plaintiff was very interested in the position, specifically the notion of being the first Veterinary Epidemiologist to create the component of a hundred-year-old program.

27.     Plaintiff twice competitively applied[2] for the position.

---

[2] Plaintiff applied twice for the position as it was curiously twice announced.

4

28.     Plaintiff was then interviewed and hired for the position, indicative of the fact that she was the best qualified candidate for the position.[3]

29.     At her new position, Plaintiff's immediate supervisor was Mr. Edwin Bowers.

30.     Mr. Bowers' position was that of Director of Field Operations in CFTEP.

31.     Upon information and belief, Mr. Bowers is not of Native American origin.

32.     Upon information and belief, Mr. Bowers is male.

33.     Upon information and belief, Mr. Bowers has no prior EEO activity.

34.     Mr. Bowers was not a veterinarian.

35.     Additionally, Mr. Bowers did not want a veterinary epidemiologist in his program, as he did not see a use for them.

36.     Moreover, Mr. Bowers did not want a Native American female in his program.

37.     In fact, Mr. Bowers had a specific non-Native American male applicant in mind to fill the position which Plaintiff was hired into.

---

[3] It should be noted that at the time when Plaintiff applied for this position, she had an exemplary, award-winning, and unblemished career with the USDA, having risen rapidly through her program. She was admired by her peers and ably demonstrated her merit as not only a veterinarian, but as an America Indian female veterinarian.

38.     Furthermore, at the time of Plaintiff's hiring, Mr. Bowers willingly and expressly stated to Billy Moses, his Assistant Director, that he did not want another female working in the CFTEP.[4]

39.     Beginning on Plaintiff's first day at her new position, Mr. Bowers, threatened by the fact that Plaintiff was a highly educated and intelligent Native American female, began discriminating against Plaintiff in severe and pervasive manner that became unwelcome and created a hostile work environment.

40.     As a result of Mr. Bowers' conduct, Plaintiff felt she was treated disparately and with disrespect, often in a bullying manner in front of Agency and state colleagues, as well as customer ranchers.

41.     On February 10, 2004, Mr. Bowers created a hostile work environment for Plaintiff when he yelled at her in front of inspectors and ranch personnel.

42.     On February 24, 2004, and continuing for months thereafter, Mr. Bowers created a hostile work environment for Plaintiff by repeatedly following her around the CFTEP District office while speaking to her in a demeaning manner.

43.     Beginning in February of 2004 and continuing for months thereafter, Mr. Bowers created a hostile work environment for Plaintiff by instructing her that she could not talk or work with any inspectors or anyone from outside of CFTEP, thus making it harder for Plaintiff to perform her duties.

---

[4] At the time Mr. Bowers stated this, there was only one (1) sole full-time permanent female employee, who served as a Mounted Patrol Inspector.

6

44.     Beginning in February of 2004 and continuing for the duration of the time that Plaintiff's duty station was in the CFTEP District office, Mr. Bowers created a hostile work environment for Plaintiff by refusing to provide her a key to the office to which she was assigned.

45.     Beginning in February of 2004 and continuing for months thereafter, Mr. Bowers created a hostile work environment for Plaintiff by routinely failing to notify her and/or excluding her from meetings that she should have been a part of.

46.     On or about March 11, 2004, Mr. Bowers acted on his resentment of strong women and created a hostile work environment for Plaintiff by telling her is a demeaning manner, "You cannot handle a firearm."

47.     Beginning in September of 2004 and continuing to the present, Mr. Bowers created a hostile work environment for Plaintiff by making her sign and incur personal accountability for every Global Positioning Satellite (hereinafter "GPS") unit, even those assigned to various other CFTEP personnel, when this was not part of Plaintiff's job requirements.

48.     On or about December 2, 2004, Mr. Bowers created a hostile work environment for Plaintiff by personally reformatted all the GPS units, making necessary program mapping more difficult for Plaintiff.

49.     On or about January 17, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he became visibly angry at Plaintiff after she asked her then second-line supervisor, AVIC Dr. Jerry Diemer, questions about position.

7

50.     On or about February 25, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he declined approval for Plaintiff's request for wildlife training, as necessary for her to successfully perform her duties.

51.     On or about March 22, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he refused to allow her to present at any future Annual VS Work Conferences, thus hampering Plaintiff's ability to grow her professional reputation.

52.     Beginning in March of 2005 and continuing until 2007, Mr. Bowers created a hostile work environment for Plaintiff when he refused to allow her to improve upon and/or modify monthly data reporting as her job would require.

53.     Beginning on on or about April 27, 2005 and continuing until 2007, Mr. Bowers created a hostile work environment for Plaintiff by refusing to allow any capture-release activities, and on at least one occasion, stating snidely in front of a bi-national audience, "I'm, talking about eradication Dr. Duhaime, not deer surveys or capture release."

54.     On or about May 10, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he issued her type-written instructions preventing her from any viable means of communication, limiting her use of office equipment, and casting aspersions on her job performance.

55.     On or about June 18 and June 20, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he copied the AVIC and Director of the Texas

Animal Health Commissions on a response to an e-mail question, damaging Plaintiff's reputation.

56.    On or about July 7, 2005, Mr. Bowers created a hostile work environment when he attempted to have his staff commit unlawful entry into her home after it was broken into while she was away.

57.    Beginning on or about July 7, 2005 and continuing through November 23, 2005, Mr. Bowers created a hostile work environment when he forced Plaintiff to work and travel the entire length of the CFTEP hazardous RIO Grande program area without viable means of communication.

58.    Beginning on or about July 7, 2005 and continuing through October 2005, Mr. Bowers created a hostile work environment when he failed to order repairs on her vandalized government issued pick-up truck and allowed others to use the vehicle with her personal and assigned government items unsecured;

59.    On August 2, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he did not allow her to present at a producer meeting, informing her in a demeaning manner, "You have not been on staff long enough."

60.    From August 15, 2005 through August 26, 2005, Mr. Bowers created a hostile work environment for Plaintiff, and showed no regard for her personal safety, by attempting to send Plaintiff on an approximately 50-mile stretch of dangerously high-centered and unpaved roadway close to the Rio Grande, with a low-to-the-ground vehicle and no public service communications. In a display of his

disregard for Plaintiff's safety, Mr. Bowers informed Plaintiff, "You should have no problems – unless it rained."

61.    From August 15, 2005 through August 26, 2005, Mr. Bowers created a hostile work environment for Plaintiff by assigning her to a non-professional administrative lower graded duty to take identification photos of the entire CFTEP workforce, which stretches over 500 miles, and instructing her that she was not to perform her assigned epidemiological duties.

62.    On September 13, 2005, Mr. Bowers created a hostile work environment for Plaintiff by failing to notify a NIOSH CDC team of epidemiologists that an epidemiologist, i.e., Plaintiff, was on staff, thereby preventing her from performing her assigned duties and leaving her to find out about the study group only when she was sent to serve as the only driver for the team.

63.    On or about October 17, 2005, Mr. Bowers created a hostile work environment for Plaintiff when he questioned a firearms instructor, in a sexist, demeaning manner by asking, "How did she qualify," and then immediately sending an embarrassing and harassing email to all work areas instructing them to not issue Plaintiff a firearm.

64.    For the fiscal year 2005 Performance Review, Mr. Bowers created a hostile work environment for Plaintiff when he filed to submit the Work Accomplishments which he had mandated to be submitted by her. Upon investigation, Plaintiff learned that Mr. Bowers had failed to submit them the previous year as well.

10

65.     On or about February 7, 2006, Mr. Bowers created a hostile work environment for Plaintiff when he phoned the AVIC, Plaintiff's second-line supervisor, irate about the tone of an email which Plaintiff had sent, only after reviewing the contents of the email with the AVIC, regarding her responsibility to be allowed to create herd plans for the program.

66.     Beginning in May of 2006 and continuing through 2010, Mr. Bowers created a hostile work environment for Plaintiff when he failed to back up any program requirements for mapping which Plaintiff had initiated, stating, "the inspectors are too busy killing ticks," and thus making Plaintiff's job more difficult.

67.     On September 25 and 26, 2006, Mr. Bowers created a hostile work environment for Plaintiff, and tried to injure her professional reputation, when he refused to share any of Plaintiff's work with CFTEP Program Review Team and attempted to disparage her during the review.

68.     On or about November 27, 2006, Mr. Bowers created a hostile work environment for Plaintiff by continuing his attempts to catch her in any wrongdoing, such as when on this date he attempted to write Plaintiff up for "requesting repairs on program equipment with no authorization," when she had not authorized any repairs.

69.     On or about February 8, 2007, Mr. Bowers created a hostile work environment for Plaintiff when he sent out a standardized reporting form for Wildlife Treatment, which Plaintiff had co-created, while later making claims that one did not exist.

11

70.      On or about June 29, 2007, Mr. Bowers created a hostile work environment for Plaintiff by acting extremely disrespectful toward Plaintiff in front of ranchers and inspectors after Plaintiff had instructed a rancher to issue a dose of one (1) CC above the labeled dosage.[5]

71.      On or about February 8, 2008, Mr. Bowers created a hostile work environment for Plaintiff when he once again refused to take any of Plaintiff's recommendations for monthly reporting.

72.      On or about April 11, 2008, Plaintiff became aware that Mr. Bowers created a hostile work environment for Plaintiff when he had previously made disparaging remarks about her to a researcher conducting interviews regarding ranchers' behavior and compliance with rules and regulations.

73.      On or about December 15, 2008, Mr. Bowers created a hostile work environment for Plaintiff when he took Plaintiff's program recommendations and later falsely attributed them to Dr. Baca.

74.      On or about April 10, 2009, Mr. Bowers created a hostile work environment for Plaintiff when he excluded her from a GAVAC vaccine trial meeting, for which she was one of the instrumental initiators.

75.      On or about September 20, 2009, Mr. Bowers created a hostile work environment for Plaintiff when, in front of a bi-national group of professionals, he

_____

[5] It should be noted the stark contrast between Mr. Bowers's treatment of Plaintiff and Dr. Baca. After Plaintiff had instructed the rancher issue a higher dosage, Mr. Bowers's response was a snide, "Are you paying for this?" In contrast, at a later point, after Dr. Baca had instructed a rancher to issue the same increase in dosage, Mr. Bowers approvingly referred to this instruction as "the Baca dose."

12

disrespectfully and with hostility said loudly to Plaintiff, "Don't touch me," after she simply tapped him lightly on the shoulder to ask him a question.

76.    On or about December 10, 2009, Mr. Bowers created a hostile work environment for Plaintiff when he refused to allow her to be the agency contact for the Animal Food Research Initiative Grant Project, as would fall under her performance elements.

77.    As part of Defendant Agency's unlawful discrimination against Plaintiff, it has misclassified and mis-graded Plaintiff's position since she started working for CFTEP.

78.    Moreover, because of her accretion of duties, but for her national origin, sex, and prior EEO activity, Plaintiff should have been graded a GS-0701-13/14.

79.    Plaintiff remains misclassified to this day.

80.    Furthermore, the Agency has failed/refused to promote Plaintiff to the GS-13 and higher grade levels to this day.

81.    In May of 2009, Dr. Kevin Varner became Area Veterinarian in Charge (hereinafter "AVIC") in Texas, making him Mr. Bowers first-line supervisor and Plaintiff's second-line supervisor.

82.    A few years following Plaintiff's arrival in the program, and after she has successfully built a working relationship with inspectors, ranchers, and collaborators, Defendant Agency began their plot to push out Plaintiff for a non-Native American male when they detailed a new veterinarian, Dr. Daniel Baca, a

non-Native American male with no prior EEO activity and no prior CFTEP experience, to work in a temporary tick outbreak office for which Plaintiff had already set up the program and process.

83. Whereas paragraphs 24 through 60, above, demonstrate Mr. Bowers's disdain for Plaintiff as a Native American female, Dr. Baca, in contrast, was treated favorably by Mr. Bowers, and Dr. Baca was not subjected to any of the treatment mentioned above.

84. In 2009, Defendant Agency further removed many of Plaintiff's duties and responsibilities when Dr. Varner assigned Dr. Baca to work as the epidemiologist for four (4) of the seven (7) work areas under the CFTEP program, leaving Plaintiff to serve as the epidemiologist in only three (3) work areas. She had been successfully been performing her duties as epidemiologist for all seven (7) work areas prior to this.

85. In January 2010, Defendant Agency further discriminated against Plaintiff when Dr. Varner named Dr. Baca as the "Lead Epidemiologist" for the entire program, including in the three (3) work areas in which Plaintiff was serving as the epidemiologist.

86. Plaintiff was and remains the only Epidemiologist who has ever competitively applied for, and was competitively selected, to serve as epidemiologist for the CFTEP position.[6]

---

[6] It should be noted that Dr. Baca never applied for the CFTEP program. Dr. Paul Ugstad, the AVIC prior to Dr. Varner, originally detailed Dr. Baca on a temporary basis, to assist the CFTEP program. When Dr. Varner arrived as AVIC, he placed

87.     In January of 2010 Dr. Varner stated that Dr. Michael Greenlee, a non-Native American male with no prior history of EEO activity, would spend twenty percent of his time as an epidemiologist for CFTEP.

88.     On or about February 18-19, 2010, Dr. Varner created a hostile work environment for Plaintiff when he failed to provide a role for Plaintiff, the Agency's only full-time CFTEP epidemiologist, at the CFTEP "Strategic Planning Meeting," whose attendance included the Agency's Regional and Riverdale staff, TAHC personnel, and program supervisors.

89.     On or about April 27, 2010, Plaintiff became aware that Mr. Bowers created a hostile work environment for Plaintiff when made derogatory remarks about her to a Program Review Team.

90.     On or about May 18, 2010, Mr. Bowers created a hostile work environment for Plaintiff when he rudely turned his back on her, ignoring her in order to speak with Dr. Baca regarding an issue in Plaintiff's area of responsibility.

91.     From June 14-17, 2010, Dr. Varner created a hostile work environment for Plaintiff when he announced to three consecutive groups of inspectors at the CFTEP Work Conference that Dr. Baca was named lead epidemiologist.

92.     On or about June 14, 2010, Mr. Bowers created a hostile work environment for Plaintiff when he yelled at her in front of one-third of the CFTEP

---

Dr. Baca into the permanent program to serve as epidemiologist. However, Dr. Baca was never hired to serve as an epidemiologist in the CFTEP program, and to this date, Plaintiff remains the only epidemiologist to be competitively hired into the CFTEP program.

workforce, the AVIC, and other professionals at the CFTEP Work Conference for an alleged error that was in fact his own error.

93.     In October 2010, Mr. Bowers created a hostile work environment for Plaintiff when he excluded her from program activities such as a meeting to discuss a Wildlife Treatment Plan, of which she was the creator, and that was to be applied to a geographic area under her responsibility; whereas Mr. Bowers invited Dr. Baca.

94.     On or about January 7, 2011, Plaintiff became aware that Mr. Bowers created a hostile work environment for Plaintiff when he excluded Plaintiff from an invitation to attend a weeklong firearms training in New Mexico which Dr. Baca had been invited to.

95.     In an attempt to push out Plaintiff for a non-ethnic male, on February 17, 2011, Dr. Varner announced his plan to  promote Dr. Baca to Technical Lead, GS-13, the equivalent to Mr. Bowers, whereas Plaintiff would stay the same.

96.     On or about February 18, 2011, Plaintiff filed an EEO discrimination case against Defendant Agency for the discriminatory conduct stated above.

97.     To attempt to cover up for their discrimination, in August of 2011, six months after Plaintiff had filed her EEO complaint, Dr. Varner named  Dr. Michael Greenlee, a non-ethnic male (who was serving in Austin at the GS 13 grade level) e with no prior history of EEO activity, would be the "lead epidemiologist," however suspiciously told only to serve as lead while also told to spend only 20% of his time working with the CFTEP.

16

98.     Dr. Baca's temporary detail has lasted for years now, over the course of which he has received preferential and unequal opportunities by Defendant Agency over Plaintiff.

99.     On or about November 26, 2013 in an effort to retaliate against Plaintiff for her prior EEO activity, Defendant Agency, through Dr. Varner, unjustly gave her a lower performance revaluation rating than she deserved, issuing her a "fully successful" rating, despite Plaintiff's having never received a rating lower than "exceeds fully successful."

## IV.     PROCEDURAL HISTORY

100.    On or about February 18, 2011, Plaintiff made initial contact with an EEO Counselor to discuss the all the incidents above which occurred prior to this date.

101.    Subsequently, Plaintiff filed her formal complaint on or about June 7, 2011.

102.    On or about January 9, 2014, the Administrative Judge issuing a decision on hearing, ruling in favor of Defendant Agency.

103.    On or about May 24, 2014, Plaintiff filed an appeal with the EEOC Office of Federal Operations.

104.    On or about December 6, 2016, the EEOC Office of Federal operations issued a final decision in favor of the Defendant Agency.

105.   On or about January 5, 2017, Plaintiff received the aforementioned final decision as well as the included "Complainant's Right to File a Civil Action." Plaintiff has filed this action under Title VII within ninety (90) days after receipt of her "Complainant's Right to File a Civil Action."

## V.   CAUSES OF ACTION

### COUNT ONE:

### NATIONAL ORIGIN-BASED DISCRIMINATION

106.   Plaintiff repeats, reasserts, and re-alleges paragraphs 1 through 105 of her Complaint.

107.   Defendant Agency engaged in intentional national origin-based discrimination when they created a harassing, hostile work environment for Plaintiff.

108.   Furthermore, Defendant Agency engaged in intentional national origin-based discrimination when they consistently mischaracterized Plaintiff's position in such a way as to unlawfully prevent Plaintiff's deserved promotion to a GS-13/14 level.

109.   Additionally, Defendant Agency further engaged in intentional national origin-based discrimination when they chose to name Dr. Baca, who is a not ethnic, as the lead epidemiologist over Plaintiff, and took away many of Plaintiff's responsibilities, despite not being neither as qualified or as senior as Plaintiff.

110.    Moreover, Defendant Agency further engaged in intentional national origin-based discrimination when they promoted Dr. Baca to serve as the new technical lead epidemiologist position with a GS-13 promotion.

111.    Defendant Agency's conduct violates Title VII of the Civil Rights Act of 1964 and 1991, and Section 102 of the Civil Rights Act of 1991. See 42 U.S.C. § 2000e, et seq.

112.    The aforementioned provision provides that no person shall be discriminated against in their employment due to their national origin.

113.    Plaintiff is of Native American origin, and is thus a member of a protected class.

114.    Plaintiff's supervisors, Mr. Bower and Dr. Varner, are upon information and belief non-Native Americans.

115.    Furthermore, Dr. Baca who was named lead epidemiologist over Plaintiff, and later promoted to the technical lead on the same level as Mr. Bowers, is upon information and belief non-Native American.

116.    Defendant Agency's actions, the creation of a hostile work environment, the consistent and pervasive mischaracterization of her position so as to illicitly deny her a promotion, and the naming of Dr. Baca to lead epidemiologist and subsequent promotion to technical lead epidemiologist over Plaintiff, were clearly unlawful national origin-based discrimination in violation of Title VII.

117.    As a result of Defendant Agency's unlawful national origin-based discrimination, Plaintiff has suffered and will continue to suffer damages in the form of loss of pay, benefits, and prestige and other damages as set forth herein.

118.    Furthermore, Defendant Agency's actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to 42 U.S.C § 1981a.

## COUNT TWO:

## SEX-BASED DISCRIMINATION

119.    Plaintiff repeats, reasserts, and re-alleges paragraphs 1 through 118 of her Complaint.

120.    Defendant Agency engaged in intentional sex-based discrimination when they created a harassing, hostile work environment for Plaintiff.

121.    Furthermore, Defendant Agency engaged in intentional sex-based discrimination when they consistently mischaracterized Plaintiff's position in such a way as to unlawfully prevent Plaintiff's well-earned promotion to a GS-13/14 level.

122.    Additionally, Defendant Agency further engaged in sex-based discrimination when they chose to name Dr. Baca, who is a male, as the lead epidemiologist over Plaintiff, and took away many of Plaintiff's responsibilities, despite being neither as qualified or as senior as Plaintiff.

123. Moreover, Defendant Agency further engaged in sex-based discrimination when they promoted Dr. Baca to serve as the new technical lead epidemiologist position with a GS-13 promotion.

124. Defendant Agency's conduct violates Title VII of the Civil Rights Act of 1964 and 1991, and Section 102 of the Civil Rights Act of 1991. See 42 U.S.C. § 2000e, et seq.

125. The aforementioned provision provides that no person shall be discriminated against in their employment on the basis to their gender.

126. Plaintiff is a female and a member of a protected class.

127. Plaintiff's supervisors, Mr. Bower and Dr. Varner, are upon information and belief both males.

128. Moreover, Mr. Bower having previously voiced his distaste for a female to work in his program.

129. Dr. Baca who was named lead epidemiologist over Plaintiff, and later promoted to the technical lead on the same level as Mr. Bowers, is upon information and belief a male.

130. Defendant Agency's actions, the creation of a hostile work environment, the consistent and pervasive mischaracterization of her position so as to illicitly deny her a promotion, and the naming of Dr. Baca to lead epidemiologist and subsequent promotion to technical lead epidemiologist over Plaintiff, were clearly unlawful national origin-based discrimination in violation of Title VII.

131.    As a result of Defendant Agency's unlawful sex-based discrimination, Plaintiff has suffered and will continue to suffer damages in the form of loss of pay, benefits, and prestige and other damages as set forth herein.

132.    Furthermore, Defendant Agency's actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to 42 U.S.C § 1981a.

## COUNT THREE:

## EEO REPRISAL

133.    Plaintiff repeats, reasserts, and re-alleges paragraphs 1 through 132 of her Complaint.

134.    Defendant Agency engaged in retaliation/reprisal for prior EEO activity when they perpetuated the hostile work environment which they created for Plaintiff.

135.    Furthermore, Defendant Agency engaged in retaliation/reprisal for prior EEO activity when they continued to consistently mischaracterized Plaintiff's position in such a way as to unlawfully prevent Plaintiff's well-earned promotion to a GS-13/14 level.

136.    Moreover, Defendant Agency further engaged in retaliation/reprisal for prior EEO activity when they issued Plaintiff a lower rating on her fiscal year 2013 performance rating than she deserved.

137.   The Agency's conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3, and 29 C.F.R. § 1614.101(b).

138.   The aforementioned provisions state that no person shall be subjected to retaliation for opposing any practice made unlawful by Title VII of the Civil Rights Act, among other laws.

139.   As otherwise set forth herein, Plaintiff engaged in prior EEO activity when she filed an EEO discrimination case against Defendant Agency in February of 2011.

140.   Upon information and belief, Dr. Varner became aware of Plaintiff's EEO activity not long thereafter.

141.   Upon information and belief, Mr. Bowers became aware of Plaintiff's EEO activity not long thereafter.

142.   Defendant Agency's actions, the perpetuation of the hostile work environment which they created for Plaintiff, the continued mischaracterization of her position so as to illicitly deny her a promotion, and issuing a lower than deserved performance rating, were clearly unlawul retaliation/reprisal for prior EEO activity in violation of Title VII.

143.   As a result of Defendant Agency's unlawful retaliation/reprisal for prior EEO activity, Plaintiff has suffered and will continue to suffer damages in the form of loss of pay, benefits, and prestige and other damages as set forth herein.

144.   Furthermore, Defendant Agency's actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to 42 U.S.C § 1981a

## VI.   PRAYER FOR RELIEF

145.   WHEREFORE, Plaintiff prays for a judgment as follows:

a.   That the Court reinstitute Plaintiff into her position of Lead Epidemiologist with full back pay and benefits pursuant to the Back Pay Act;

b.   That the Court correct her position to the GS-13/14 grade level;

c.   That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendant Agency's conduct in an amount in excess of the jurisdictional limits of the District Courts of the United States of America – specifically and amount exceeding $300,000 per claim;

d.   That the Court grant Plaintiff expenses of litigation, including reasonable attorneys' fees and costs, pursuant to the Title VII, and/or 42 U.S.C. §1988;

e.   That the Court grant Plaintiff a jury trial;

f.   That the Court grant Plaintiff all other relief the Court deems just and proper; and

g.  That the Court grant temporary, preliminary, and permanent

injunctive relief prohibiting Defendant Agency from engaging in

further discriminatory conduct.

Respectfully submitted on this 5th day of April, 2017,

_____

Roberta Duhaime, Plaintiff
905 Sunchase Street
San Juan, Texas 78589
956-286-1696
roberta.duhaime@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 5, 2017, she filed the foregoing in

person with the Clerk of the CM/ECF system, which will send notifications of such

filing to

_____

Roberta Duhaime, Plaintiff